STATE OF NEBRASKA, APPELLEE, v. GUY C. DAVIS, APPELLANT.

500 N.W.2d 852

Filed February 9, 1993.   No. A-91-1133.

James R. Mowbray, of Mowbray & Walker, P.C., for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

HANNON, IRWIN, and MILLER-LERMAN, Judges.

IRWIN, Judge.

This is an appeal from the district court for Lancaster County, Nebraska. Appellant, Guy C. Davis, was convicted following a jury trial. He was found guilty of two counts of sexual assault in the first degree. See Neb. Rev. Stat. § 28-319 (Reissue 1989). First degree sexual assault is a Class II felony. § 28-319(2). Appellant was subsequently sentenced to an indeterminate sentence of 10 to 20 years' imprisonment on each count. These sentences were to be served concurrently. We affirm.

## I. ASSIGNMENTS OF ERROR

Appellant alleges several assignments of error. They consist of the district court's error in (1) finding sufficient evidence for the jury to convict appellant on each count, (2) failing to direct a verdict in appellant's favor on count I, (3) overruling appellant's objection to certain hearsay evidence, (4) overruling appellant's objection to evidence regarding appellant's sexual preference, (5) failing to properly instruct the jury on reasonable doubt and on direct and circumstantial evidence, (6) failing to sustain appellant's motion for a new trial, and (7) abusing its discretion by imposing excessive sentences.

## II. FACTUAL BACKGROUND

Viewing the evidence at trial most favorably to the prosecution, as we must, *State v. Lewis*, 241 Neb. 334, 488 N.W.2d 518 (1992), we find that the evidence establishes the following facts: K.L. and her two sons, Br.L. and Bl.L., moved to the Lake Park Condominiums in Lincoln, Nebraska, in September 1984. Br.L. and Bl.L. are the victims relating to the two charges. Evidence of many sexual assaults was introduced. However, appellant was charged with only one count of sexual assault regarding each child. Appellant was charged with an assault of Bl.L. that took place on September 1, 1986. Appellant was also charged with an assault of Br.L. that took place on November 22, 1990. Bl.L.'s date of birth is May 28, 1983. Br.L.'s date of birth is May 3, 1979. Appellant moved into an apartment next door to K.L. and her sons. K.L. and appellant then became acquainted. At trial, K.L. recounted a conversation between appellant and herself which took place in her apartment at Lake Park. During that conversation, appellant told her that he was bisexual. The same subject came up a few days later, and appellant said that he had just made up the remarks (regarding bisexuality) and that he had only wanted to see how she would react. Objections of relevancy and hearsay were lodged by appellant regarding this particular testimony. Both objections were overruled.

In January 1986, K.L. and her sons moved to Monticello Drive in Lincoln. On September 13, 1986, appellant and K.L. were married, and appellant then moved into the residence on

Monticello Drive. In March 1987, a daughter, A.D., was born to the couple. During this timeframe, appellant was working a few hours in the morning as a cohost for a television talk show. K.L. was a teacher at a local community college. Her hours were typically from 2 to 10 p.m.

Late in the summer of 1987, Patricia Pella was hired as a nanny for the children. Appellant left his employment with the television station in September 1987. Pella testified at trial that appellant was at home most of the day. Br.L. testified that some of the sexual assaults committed by appellant occurred at the Monticello Drive address. He stated that these assaults usually occurred in his mother and stepfather's bedroom. The younger son, Bl.L., also testified that he was the victim of a sexual assault by appellant in a closet of the bedroom in the Monticello Drive residence.

In January 1988, the family moved out of the Monticello Drive residence. They moved to a rental property for a few weeks until taking possession of a newly purchased home on Haverford Drive.

Pella left her employment as a nanny for the children in July 1988. She testified that during her employment she had witnessed appellant take the boys to a bedroom for a spanking 8 to 10 times each. She also testified that Bl.L. appeared to be afraid of appellant. In July 1988, Barbara Brown became the nanny for the children. She said that appellant and Br.L. went into the computer room at least once a day in the afternoon and that at times the door to that room was kept locked. Appellant told her that this was to keep A.D. out of the room. However, A.D. was not tall enough to reach and turn the doorknob. Brown testified that appellant and Br.L. stayed in the room a minimum of 1 hour at a time. She observed that the boys behaved as if they did not want to be left alone with appellant. K.L. also testified that the boys were fearful of appellant. Br.L. testified that many of the sexual assaults took place in the computer room at the Haverford Drive residence. In July 1989, K.L. and appellant separated. K.L. testified that after deciding to separate, but prior to leaving the residence, appellant again told her that he wanted her to know that he was bisexual. There was no objection to the questioning regarding the topic at this

time. The parties did in fact divorce, and that decree became final on March 29, 1990. Visitation was arranged regarding A.D. K.L. and appellant had occasional contacts with each other after the divorce, and in fact, reconciliation was discussed in August 1990. K.L. testified that she did not believe her sons were aware of this.

In October 1990, appellant was disturbed about the unkempt condition of the house in which A.D. was residing. He telephoned K.L. later and told her that he was going to attempt to get custody of the child after he married a woman he had been dating for several months. According to appellant, K.L. responded that if he tried to get custody of A.D., she would claim that he was bisexual and that bisexual men abuse their daughters. However, K.L. testified that she had told appellant that she would fight him regarding custody of A.D. and that she believed a judge would be interested in knowing about his violent past and his sexual preference. She further testified that this disagreement soon waned and that by November 1990, she and appellant were on amicable terms. In fact, appellant was invited to K.L.'s residence for Thanksgiving dinner on November 22. On Thanksgiving day, while A.D. was napping and the boys were downstairs, appellant and K.L. had sexual relations. One of the children knocked on the door and tried the bedroom door handle while appellant and K.L. were in the bedroom.

Later that evening, Br.L. and A.D. went to appellant's residence to spend the evening with him. Prior to this date, Br.L. had not spent the night unaccompanied at appellant's apartment. Br.L. testified that he played with the computer at appellant's apartment, which computer was located in the bedroom. He testified that appellant asked him whether he would like to sleep in the bedroom or on the air mattress with his sister and that he replied he wanted to sleep on the air mattress. Br.L. testified that later appellant pulled him down on the air mattress that was to be used for him and A.D. to sleep on. This was the site of the sexual assault upon Br.L. that was charged in the information.

Br.L.'s testimony included a description of the sexual assault at the apartment. He described in detail appellant's fondling of

him, how appellant tried to pull off the boy's sweat pants, and the events that followed. Appellant eventually overpowered Br.L., pinning the child to the floor, and committed fellatio on the resisting 11 year old. Appellant eventually discontinued the assault, and Br.L. reached for the telephone to call his mother. Appellant quickly hung up the telephone and asked Br.L. what he was doing. Appellant later allowed Br.L. to call home after they had discussed what Br.L. would say. K.L. testified that Br.L. called her at approximately 11:45 p.m. After asking Br.L. to let her speak with appellant, she could overhear appellant ask Br.L. what he had told her. Later, Br.L. again got on the line. His mother asked if appellant had done something that made him want to come home, and Br.L. answered, "[Y]es."

Br.L. testified that prior to his mother's arriving to pick him up, appellant questioned him as to whether or not he had been involved with similar-type conduct with his friends. Appellant said he never meant to hurt Br.L. and asked whether Br.L. thought it was wrong to do these types of things. Appellant also told Br.L. that he thought Br.L. "wanted to" do it.

K.L. testified that after she picked up Br.L., he would not look her in the eye and had a hard time telling her what had happened. She asked if appellant had yelled at or hit Br.L., and he responded, "[N]o." When asked if appellant had touched him, Br.L. began to speak of the sexual contact. This was the first report by either of the boys of any sexual assault. K.L. called the police shortly after Br.L.'s report. The police arrived at approximately 2 a.m. Officer James Foral was the investigating officer who took the statement at the Haverford Drive residence. The officer testified that he spoke with K.L. first and that she woke up Br.L. so that he could visit with Br.L. Br.L. appeared to be a little groggy at the beginning of the interview, rubbing his eyes and yawning several times.

Br.L. told the officer about the various things that had happened that evening and on previous occasions. Br.L. reported that the first incident of this type had occurred about a year and a half after his mother and appellant were married. He further stated that appellant had taken him into a bedroom at the Monticello Drive address, had him lie on the bed, told him to put a pillow over his face, and then started to touch Br.L.'s

penis. Eventually, the sexual acts evolved to include appellant's performing fellatio on Br.L. while he lay on the bed with his head covered by a pillow. Br.L. testified that these sexual assaults usually occurred in appellant's bedroom. The assaults also occurred in the computer room at the Haverford Drive address. Eventually, appellant had Br.L. perform fellatio on appellant while he did the same to Br.L.. Br.L. said this occasionally happened when Brown, the nanny, was at home. He said that appellant would sometimes lock the door before the sexual activities occurred. Br.L. also testified concerning the appearance and taste of the substance which would come out of appellant's penis when Br.L. was forced to perform fellatio.

During the trial, when Officer Foral was asked what Br.L. had told him, an objection was made on the basis of hearsay. This objection was overruled, the court stating that the testimony was admissible for the purpose of rebutting any recent fabrication, rebutting a claim of improper motive, and aiding the jury in assessing whether the statements were consistent. A continuing hearsay objection by the defense was noted by the court regarding the statements to authorities by both of the boys. Officer Foral then stated what Br.L. had reported. He also testified regarding Br.L.'s demeanor during the interview.

On November 25, police returned to K.L.'s residence to obtain a taped statement from Br.L. K.L. had told Bl.L. that the police were coming, so that he would not be alarmed when they arrived. Upon being told, Bl.L. began to cry. K.L. testified Bl.L. then told her that he did not know that what he had been involved with was against the law and that he was afraid he might be gay. Omitting the details of what Bl.L. told her had occurred, she related the general nature of the offense regarding appellant. As a result of this conversation, K.L. suggested to the police that they also speak to Bl.L. This testimony was objected to on the basis of hearsay, but the objection was overruled by the trial court.

Officer Foral testified about his obtaining a taped statement from Br.L. He repeated what Br.L. had told him about the incident at appellant's apartment and what Br.L. had said about

prior assaults. The officer said he also spoke with Bl.L. for about 5 to 10 minutes. He iterated that Bl.L. had said that appellant made him touch appellant's penis three or four times. On one occasion, appellant had come out of the shower and made Bl.L. perform fellatio for about 1 minute. He said Bl.L. described the size of appellant's penis and also described how it felt to the touch. Bl.L. also spoke of the closet incident and the Haverford Drive incident. The officer also described Bl.L.'s demeanor.

On cross-examination, the officer admitted that Bl.L. had supplied more details about the shower incident than about the closet incident. Bl.L. had told the officer that the shower incident was the only one he really remembered.

Bl.L. testified that appellant had lured him into a closet at the Monticello Drive address under the guise of receiving a treat and then forced Bl.L. to perform fellatio on appellant. He also recounted an incident at the Haverford Drive address when appellant called him into the bathroom and asked him to perform fellatio. The youngster testified that he ran out the door.

On cross-examination, defense counsel used a deposition of Bl.L. to impeach him. Several of what seemed to be inconsistencies were pointed out by defense counsel. One of these inconsistencies was from a statement given to police in which Bl.L. had referred to an assault which occurred in the bathroom after Bl.L. came out of the shower. Bl.L. testified that he did not recall giving this information to the police. On redirect examination, Bl.L. testified he did not recall having informed the police about the closet incident. Bl.L. said that the incident had occurred about 2 years before and that he had a difficult time remembering the details.

Testifying on his own behalf, appellant explained that K.L. had been displeased with his method of disciplining the children. He acknowledged having teased Bl.L., but not to the extent described in the State's case in chief. He also mentioned the October 1990 verbal argument he had with K.L. regarding custody of A.D.

Appellant's version of what transpired at his apartment on Thanksgiving night was that he and Br.L. had wrestled on the

mattress and that Br.L. had begun to pout after appellant pinned him. Appellant stated that he may have asked Br.L. what he had told his mother during the telephone call, since he thought Br.L. might have mentioned that appellant had gotten rough with him. He denied having ever sexually assaulted either boy.

The defense also called Officer Foral and another police officer. Appellant's attorney offered transcriptions of the taped statements of Br.L. and Bl.L. into evidence through Officer Foral, and the exhibits were received without objection.

The trial lasted 2 days. The jury returned verdicts of guilty on both counts I and II. Appellant filed a motion for new trial, which motion was overruled by the trial court.

Appellant was sentenced by the district court after it was determined that appellant was not a mentally disordered sex offender. The court sentenced appellant to a term of imprisonment of not less than 10 years nor more than 20 years on each count, with the sentences to be served concurrently.

## III. DISCUSSION OF ASSIGNMENTS OF ERROR

### 1. SUFFICIENCY OF THE EVIDENCE

Appellant asserts that his motion for directed verdict on count I, involving the crime committed against Bl.L., should have been granted. Additionally, he claims that the evidence was insufficient to convict him of either of the two charges.

The standard of review regarding a motion for a directed verdict was recently set forth in *State v. Schumacher*, 240 Neb. 184, 480 N.W.2d 716 (1992):

> In a criminal case a court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged, or (2) evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained.

*Id.* at 186, 480 N.W.2d at 718, quoting *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989).

The standard of review regarding the sufficiency of evidence necessary to sustain a conviction in a jury trial was stated in *State v. Fleck*, 238 Neb. 446, 447, 471 N.W.2d 132, 134 (1991):

In determining whether evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict.

Appellant's argument regarding the motion for directed verdict as to count I and the motion for new trial is not that there was a complete failure of evidence to establish an essential element of the crime charged. It is directed at the character of this evidence. He argues that the evidence is so doubtful in character and so lacking in probative value that the jury's guilty verdict cannot be sustained.

Appellant lists several items which he feels support the argument that the evidence lacks sufficient probative force as a matter of law. These items include (1) that no complaint had been made by either boy prior to November 1990; (2) Bl.L.'s credibility, regarding his inability to recall certain specifics surrounding the assaults, including an inability to recall whether or not appellant was standing in the closet during the assault; (3) Bl.L.'s inability to remember what appellant's penis felt like; (4) Bl.L.'s inability to recall telling Officer Foral about the bathroom incident; (5) "ample evidence that [Bl.L.] made up this report," brief for appellant at 16, because he was glad that appellant had moved out; (6) the fact that Br.L. testified at trial that on one occasion appellant had ejaculated while forcing the victim to perform fellatio and that this was never mentioned to police or during a deposition; (7) Br.L.'s not knowing whether or not appellant had an erection, although Br.L. had allegedly performed fellatio; (8) Br.L.'s statement to police regarding the number of times that he had been sexually assaulted; (9) Br.L.'s not accurately testifying as to how long on November 22, 1990, appellant allegedly performed fellatio on Br.L.; (10) Br.L.'s clear motive to make up the story, since he did not like appellant; (11) Br.L.'s statements regarding the duration of the sexual contact on November 22; and (12) disparities in testimony regarding the number of sexual contacts

over the years.

It would seem quite plausible and reasonable for a juror to conclude that it was not unusual for such youthful witnesses to be less than precise concerning incidents which occurred at such a young age. Also, it could have been concluded that it was not unusual for a child to have repressed, totally or partially, incidents taking place several months and years before trial. Reasonable jurors could find that such discrepancies were due to the healing passage of time rather than due to the original report having been contrived. The boys' extended silence under the circumstances does not seem unusual. The passage of time until reporting is not fatal to the State's case.

Also, the jury could readily have accepted that the explanation for these supposed inconsistencies was the fact that human beings do not use calculators to keep track of sexual assaults perpetrated on them or stopwatches to time their specific duration. After a careful review of the evidence, we find that the jury could in fact find appellant guilty beyond a reasonable doubt. The testimony against appellant was not so lacking in probative force as to be insufficient as a matter of law.

## 2. Evidentiary Rulings

Several of appellant's assigned errors regard rulings by the trial court on the admissibility of evidence. We begin the discussion of these assignments of error by remembering that in proceedings where the statutes embodying the Nebraska rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992).

### (a) Introduction of Boys' Statements

Appellant claims that the district court erred in overruling his objection to hearsay evidence offered by the State from Officer Foral. The officer was asked to testify about the statements that Br.L. and Bl.L. had given to him. Appellant objected and argues that these statements were hearsay, reasoning that the prosecution was attempting to rehabilitate the victims' testimony by using prior consistent statements.

It appears that the admission of the statements through Officer Foral, even if improper, was harmless. Neb. Rev. Stat. § 27-103 (Reissue 1989) provides that "(1) [e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ." Appellant himself introduced the transcriptions of the statements of both boys to the officer. These statements were offered and received without objection. Having offered the statements to take advantage of any inconsistencies that might be present, appellant may not now complain.

(b) Testimony Regarding Appellant's Bisexuality

Appellant asserts that K.L. improperly testified regarding appellant's statements about his bisexuality. Appellant complains that the State was permitted to improperly present evidence regarding his being bisexual.

It would appear that the State's evidence was properly admissible because, if believed, it corroborated the boys' testimony. Testimony that the appellant may be bisexual is relevant because the sexual assaults were committed by a male upon a male. This evidence of bisexuality, if believed, tended to show appellant's motive and intent to commit the crimes at issue and was admissible. See, *State v. Yager*, 236 Neb. 481, 461 N.W.2d 741 (1990); *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989).

(c) Jury Instructions

Appellant claims the trial court erred in regard to the reasonable doubt instruction and the direct and circumstantial evidence instruction. Both instructions were objected to by appellant, and the objections were overruled.

The applicable rule regarding jury instructions is that all the instructions given must be read together and that if taken as a whole they correctly state the law, are not misleading, and adequately cover the issues, there is no prejudicial error. *State v. Brandon*, 240 Neb. 232, 481 N.W.2d 207 (1992); *State v. Bridger*, 223 Neb. 250, 388 N.W.2d 831 (1986).

Appellant's objection is that neither instruction followed the pattern instruction set forth in the Nebraska Jury Instructions (NJI).

The reasonable doubt instruction given by the court stated:

A reasonable doubt is one based upon reason and common sense after careful and impartial consideration of all the evidence. Proof beyond a reasonable doubt is proof so convincing that you would rely and act upon it without hesitation in the more serious and important transactions of life. However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

The direct and circumstantial evidence instruction stated:

There are two kinds of evidence, direct and circumstantial.

Direct evidence is either physical evidence of a fact or testimony by someone who has first-hand knowledge of a fact by means of his or her senses. Circumstantial evidence is evidence of a fact from which another fact logically can be inferred.

A fact may be proved by direct evidence alone; by circumstantial evidence alone; or by a combination of both.

Appellant raises two questions in regard to these instructions: (1) whether or not they adequately state the correct and applicable law and (2) whether or not the trial court misused the pattern instructions in a criminal case.

This case was tried in September 1991. Effective March 1989, a revised Nebraska Supreme Court rule states that Nebraska Jury Instructions, Second Edition (NJI2d), is designed for use when the instruction correctly states the law and the pleadings and evidence call for such an instruction. The rule continues by stating that, where applicable, a trial judge *may* utilize the appropriate instruction from NJI. The rule goes on to state that "[t]he rule of practice adopted by this court on November 20, 1968, requiring use of the Nebraska Jury Instructions is hereby rescinded." NJI2d Crim. at xii (proposed May 1989). In *State v. Bridger, supra*, the Nebraska Supreme Court held that the trial court's modification of a jury instruction had prejudiced the defendant, since the instruction given had omitted an essential definition contained in NJI. The defendant had requested that the instruction be taken directly from NJI. Notably, however, the court indicated that not every modification to the pattern

jury instruction would constitute prejudicial error. The applicable rule was stated to be as follows: "All of the instructions given must be read together, and if taken as a whole correctly state the law, and are not misleading and adequately cover the issues, there is no prejudicial error." *Id.* at 255, 388 N.W.2d at 835.

We conclude from this series of cases that so long as there is an NJI instruction that accurately states the law and applies to the case, it is the instruction which should be given. However, modifications to that pattern instruction will not necessarily require reversal.

Appellant does not explain what it is in the challenged instruction regarding reasonable doubt that is incorrect. It accurately states the law, is not misleading, and would not serve to prejudice appellant in any way.

With regard to appellant's objection to instruction No. 10, regarding direct and circumstantial evidence, appellant's complaint is that "[t]he challenged instruction contains no language about inferences, and how inferences are to be drawn, as well as any language regarding any reasonable hypothesis of innocence." Brief for appellant at 34. Appellant further complains that the instruction neglects to inform the jury that when circumstantial evidence is being relied upon, the facts essential to the conclusion must be proved by competent evidence beyond a reasonable doubt. A reading of the instruction shows that it does correctly and adequately apprise the jury concerning the drawing of inferences.

Although instruction No. 10 does not contain language concerning the necessity of proof beyond a reasonable doubt, the jury was already instructed regarding reasonable doubt in instruction No. 6. Nothing in the circumstantial evidence instruction detracts from the proof beyond a reasonable doubt requirement.

" 'In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.' " *State v. Jasper,* 237 Neb. 754, 757, 467 N.W.2d 855, 858 (1991), quoting *Rose v. City of Lincoln,* 234 Neb. 67, 449 N.W.2d 522 (1989).

Since the challenged instructions accurately state the law, were not misleading, and did not deprive appellant of a substantial right, no reversal is required because of the trial court's decision to instruct in accordance with the proposed criminal jury instructions in lieu of the ones found in the 1969 pattern jury instructions.

### 3. RULING ON MOTION FOR NEW TRIAL

The standard of review of an order denying a new trial is whether the trial court abused its discretion. *Kumar v. Douglas County*, 234 Neb. 511, 452 N.W.2d 21 (1990). Appellant's argument concerning this assignment of error consists of the following lines:

> Prior to sentencing [appellant] filed his motion for new trial. A hearing was held on September 24, 1991, wherein the court overruled the motion in all respects. Without rearguing all the legal and factual issues surrounding the court's erroneous ruling [appellant] incorporates all arguments and authorities discussed previously.

Brief for appellant at 35.

After carefully reviewing the arguments previously discussed in appellant's brief, we find that the overruling of appellant's motion for new trial was not incorrect.

### 4. SENTENCE

In his final assignment of error, appellant asserts that the trial court erred in the sentence imposed. The Nebraska Supreme Court has held in *State v. Haynie*, 239 Neb. 478, 490-91, 476 N.W.2d 905, 914 (1991):

> As a general rule, a sentence imposed within the limits prescribed by statute will not be set aside as excessive absent an abuse of discretion. *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990). It is also within the trial court's discretion to direct that sentences imposed for separate crimes be served consecutively. *State v. Zaritz*, 235 Neb. 599, 456 N.W.2d 479 (1990).
>
> In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct,

motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Nevels, supra.* "Moreover, it is the minimum portion of an indeterminate sentence which measures its severity." *Nevels, supra* at 53, 453 N.W.2d at 588. Thus the important prong of the sentence is the minimum sentence of 68 years. In light of the defendant's age and insignificant prior criminal record, it is relevant to note that a sentence of imprisonment ought not exceed the minimum period consistent with protection of the public, gravity of the offense, and rehabilitative needs of the defendant. See *State v. Sturm*, 189 Neb. 299, 202 N.W.2d 381 (1972). Also, it is important to consider the rehabilitative needs of the defendant in sentencing, such as his or her addiction to narcotic drugs. One of the primary functions of the criminal law is to protect individuals and society from the depredations of the criminally bent. *State v. Etchison*, 188 Neb. 134, 195 N.W.2d 498 (1972).

The offenses for which appellant was convicted were Class II felonies, with penalties of from 1 to 50 years' imprisonment. See § 28-319(2) and Neb. Rev. Stat. § 28-105 (Reissue 1989).

Appellant contends that the sentence of 10 to 20 years on each count, to be served concurrently, was excessive. In support of his position that the sentences were excessive, appellant points to his age, mentality, education, experience, social and cultural background, and past law-abiding conduct.

A consideration which must be borne in mind is the fact that sexual assaults on children are extremely serious and deplorable crimes. See *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989). Appellant was in a position of responsibility and authority regarding the two young boys. He abused that position egregiously. Appellant was attending criminal justice classes and stated that his goal was to eventually get a law degree. It would appear there is no question that he knew that what he was doing was against the law. Despite that fact, this activity continued over a period of years. It would also seem that he was attempting to persuade both boys that such behavior was normal and appropriate.

Appellant mistakenly argues that the boys were not harmed

and asserts that the court had to speculate to find injury. While it may be true that the type of harm caused by appellant's actions may not be measurable, or even manifest itself completely, for a long period of time, the fact that injury does result from these types of assault would seem to be common knowledge by this time. A counselor for one of the boys testified that the boy had manifested symptoms of depression, as evidenced by headaches, stomach ailments, missed school, and fatigue in the year immediately preceding his reporting of the sexual assaults. A letter in the presentence investigation from a therapist indicated that a 2-year program of therapy may be necessary for Br.L. and that a program of several months will be necessary for Bl.L.

In light of the seriousness and continuing nature of the offenses, the trial court did not abuse its discretion in sentencing appellant as it did, and this court does not otherwise find the sentences excessive. See *State v. Armstrong*, 1 NCA 101, 485 N.W.2d 341 (1992).

### IV. CONCLUSION

All of appellant's assigned errors are without merit. The decision of the lower court is affirmed.

AFFIRMED.